IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | |
|---|---|
| ALARM FUNDING ASSOCIATES, LLC, a Maryland limited liability company,<br><br>　　　　　Plaintiff,<br>　vs.<br><br>TASSIN INTEGRATED SYSTEMS, LLC, a Louisiana limited liability company; and NICHOLAS TASSIN, individually,<br><br>　　　　　Defendants. | Civil Action No. 1:17-cv-03131-RDB |

**Memorandum of Law in Support of Plaintiff's Motion for Default Judgment**

Plaintiff, Alarm Funding Associates, LLC, submits this Memorandum of Law in Support of its Motion for Default Judgment. In support of this Motion, Plaintiff incorporates the Declarations filed concurrently herewith and documents submitted under seal.

**STATEMENT OF ADMITTED FACTS[1]**

1.　Alarm Funding Associations purchases security monitoring contracts from independent dealers to provide dealers with capital in exchange for the future revenue generated by the customer contracts.

2.　In doing so, AFA and the dealer hold AFA out to the dealer's customers as a new billing and collections specialist for the dealer, but in reality, AFA actually owns the dealer contracts.

---

[1] Greg Westhoff's Declaration filed in support of this motion (Exhibit 5) supports a finding of each enumerated fact. Paragraph numbers 1-25 in this brief correspond to the paragraph numbers in Westhoff's Declaration.

3. Defendants are engaged in the sale, installation and monitoring of residential and commercial burglar and fire alarm systems in the areas surrounding Metarie, LA, including areas in Mississippi.

4. Defendant Integrated is not licensed to sell, install or monitor alarm systems in the state of Mississippi.

5. The AFA business model enables dealers, like Integrated and Tassin, to maintain their relationships with their customer base even though they have sold the customer contracts to AFA.

6. The business model is advantageous to dealers like the defendants because it allows them to generate additional revenue through service calls or referrals generated by the very same customer base it no longer owns.

7. AFA's business model also depends on preserving the goodwill of the customer base to insure the customer base will continue to make monthly payments in the future and AFA's dealers and owners are contractually required to take and avoid certain actions in order to maintain good working relationships with the parties' mutual customers.

8. Defendant Integrated sold 715 customer accounts to AFA through a series of three agreements in exchange for initial payments totaling in excess of $520,000 These contracts are as follows:

    a. On March 26, 2014, AFA and Defendants signed the first of three Account Purchase and Sale Agreements ("APSA1") in which AFA purchased some of Integrated's customer accounts. See Exhibit 2, filed under seal. The

2

contract required AFA to pay a multiple of recurring monthly revenue generated by each account to Integrated. In exchange, AFA acquired the customer accounts and the associated right to receive all future revenues from each account for a certain period of time.

      b.     On November 21, 2015, the parties executed a second APSA ("APSA2") with terms substantially the same as those in APSA1. See Exhibit 3, filed under seal.

      c.     On March 31, 2017, the parties executed a third APSA ("APSA3") with terms substantially the same as those in APSA1. Each contract has an Exhibit A setting forth the details of the accounts purchased with the total recurring monthly revenue for each. See Exhibit 4, filed under seal.

Collectively these Contracts are referred to as the APSA Contracts. The APSA Contracts are attached to Westhoff's Declaration filed in support of AFA's Motion to Seal.

    9.     Each APSA Contract has an Exhibit A setting forth the details of the accounts purchased with the total recurring monthly revenue for each. Exhibit 1 filed under seal in support of Plaintiff's Motion for Default Judgment is a compilation of all customer accounts purchased under the APSA Contracts.

    10.    Section 7.3 of the APSA contracts require Defendants to cause the customer accounts to communicate with AFA's own designated central station at Defendant's expense.

    11.    Section 7.3 also states that AFA shall take over all 800 lines associated with

the purchased accounts, which was necessary to transfer the monitoring services from the third-party over to AFA's central station, i.e., "swinging" the line.

12. Defendants have refused to swing or reprogram the lines associated with Defendants' customer accounts over to AFA's central station and provide AFA with information necessary to insure continued monitoring, such as customer programming codes. See also Exhibit 6, Declaration of Kathleen Gonzales, ¶9. The refusal to provide AFA with the programming codes will increase the cost of moving the monitoring over to AFA's third-party central monitoring station.

13. Plaintiff will also have to pay a technician to manually reprogram and/or replace each customer panel so that it will communicate with Plaintiff's own designated central station, which Defendants are required to do under Section 7.3 of the APSA Contracts.

14. Defendants utilize a remote downloader on their computer so they can dial into each customer panel at any time. They use a lock out code to communicate with the alarm panel and make any reprograming changes, including to which central station the alarm panel reports.

15. Defendants have been remotely reprograming Plaintiff's customers so that their alarm panels will report to a different central station than that agreed upon in Section 7.3 of the APSA Contracts.

16. Had Defendants provided the lock out codes as required under the APSA Contracts, it would have only been necessary to pay for labor and reprogramming at each customer location.

17. Because Defendants did not provide the lock out codes, Plaintiff will have to actually replace the customer's equipment in order to reprogram it to the central station to obtain compliance with Section 7.3. Based on AFA's historical experience in the industry, Plaintiff anticipates it will spend $400 per account to forcibly reprogram each panel for each purchased account in order to transfer the monitoring. AFA still needs to reprogram 128 panels in connection with APSA3. At $400 per panel, Plaintiff will incur damages of $51,200 in order to reprogram the panels.

18. With respect to solicitation and customer loss, Exhibit C to the APSA contracts state:

> AFA shall pay to Seller, which payments will benefit Seller, as consideration for this Agreement the, amounts called for under the Purchase and Sale Agreement for the Alarm Accounts. In recognition and specific acknowledgment of AFA's legitimate need to protect its investment in the Purchased Accounts, Seller, jointly and severally, covenant and agree that they shall not:
>
> *********
>
> (b) for a period of ten years following the date of transfer of each Alarm Account under the Purchase and Sale Agreement, directly or indirectly on his or its own behalf or as seller, employee or consultant for another, contact, solicit or otherwise seek to do business with such Alarm Account providing services for which such Alarm Account is obligated to make payments of Monitoring Rate (as defined in the Purchase and Sale Agreement) to AFA, or accept or otherwise engage in any such business with such Alarm Account other than those allowed under the terms and conditions set forth in Section 8, Maintenance Services and Post-Closing *Payment* for Net Monthly Maintenance Revenue, and Section L4 (d), Revenue Guarantee Adjustment, of the Purchase and Sale Agreement
>
> (c) for a period of ten years following sale of a Purchased Account by AFA, directly or indirectly on his or its own behalf or as seller, employee or consultant for another, contact, solicit or otherwise seek to do business with such Purchased Account providing any services in the residential or commercial burglar or fire alarm business, or accept or otherwise engage in any such business with such Purchased Account other than those allowed under the terms and conditions set forth in Section 8,

    Maintenance Services and Post-Closing Payment for Net Monthly Maintenance Revenue, and Section 1.4 (d), Revenue Guarantee Adjustment, of the Purchase and Sale Agreement

  19. Defendants have told customers that they should continue making payments to Defendants because Defendants are no longer using AFA. See also Exhibit 6, Declaration of Kathleen Gonzales, ¶7.

  20. Defendants are also attempting to resell the same APSA Contract customers to competing dealers. See also Exhibit 7, Declaration of James Miller.

  21. Integrated and Tassin are irrevocably destroying the goodwill essential to AFA receiving the benefit of its bargain by telling customers that AFA is incompetent and to make payment to Integrated instead of AFA.

  22. If left unchecked and unrestrained, AFA stands to lose the benefit of its bargain with Defendants. Plaintiff brings this suit to enjoin Defendants from stealing additional accounts and for money damages associated with its conduct.

  23. Plaintiff purchased 251 accounts from Defendant through the APSA3 contract. AFA typically experiences a loss of approximately 5% of accounts in any given portfolio during the year after acquiring the accounts. In this case, AFA has lost 123 APSA3 accounts within the first year, which is nearly 50% of Defendant's APSA3 portfolio since closing a year ago. The loss rate on the APSA3 portfolio is ten times more than the loss rate AFA normally experiences.

  24. AFA has been in business since 2005. It has purchased more than 200,000 accounts since its inception. The overwhelming majority of accounts AFA has purchased from dealers continue to pay monthly revenue equal to or more than the

initial rate for more than 5 years post-closing. AFA's historical gross margin of return, or profit, on each account is 72%.

25. In this case, AFA has lost 123 accounts representing a total loss of $4,259.55 in recurring monthly revenue. Defendant has failed to replace the accounts. The lost profits on these accounts is $184,268, which is calculated by applying AFA's historical gross margin of return to the lost monthly revenue multiplied by 60 months. Therefore, AFA has lost $184,268 in profits as a result of Defendant's failure to replace lost accounts as required by Section 1.4 of APSA3.

26. Defendants judicially admit that Defendant Nicholas Tassin has been telling customers within the Portfolio that AFA is incompetent or that he is no longer dealing with AFA and that the customer/s should resume paying Defendants instead of AFA. See Complaint, ¶41; see also Exhibit 6, Declaration of Kathleen Gonzales.

27. Defendants judicially admit that they have been accepting payments from customers within the Portfolio that belong to AFA. See Complaint, ¶42.

28. Defendants' judicially admit their conduct threatens to destroy the goodwill and financial viability of the Portfolio. See Complaint, ¶43.

29. Defendants judicially admit they are also actively soliciting AFA's competitors to sell the very same accounts they sold to AFA. See Complaint, ¶45-49 see also Declaration of James Miller, President of SEP.

30. In particular, Defendants judicially admit they have negotiated with SEP Holding Company, LLC, doing business as SEP Funding, for the sale of customer accounts that belong to AFA. See Complaint, ¶45-49; see also Exhibit 7, Declaration of

James Miller, President of SEP.

31.     Defendants and SEP Funding executed documents for the "resale" of hundreds of accounts Integrated previously sold to AFA. See Complaint, ¶45-49; see also Declaration of James Miller, President of SEP.

32.     Defendants and SEP Funding were scheduled to close on their transaction on October 30, 2017, but SEP Funding uncovered Defendants' attempted fraud and cancelled the transaction. See Complaint, ¶45-49; see also Declaration of James Miller, President of SEP.

## ARGUMENT

It is within the court's discretion to grant default judgment when a defendant is unresponsive. See Park Corp. v. Lexington Ins. Co., 812 F.2d 894, 896 (4th Cir. 1987) (upholding a default judgment when the defendant lost its summons and did not respond within the proper period). In determining whether to award a default judgment, the Court will take as true the well-pleaded factual allegations in the complaint, other than those pertaining to damages. Ryan v. Homecomings Fin. Network, 253 F.3d 778, 780 (4th Cir. 2001). A district court may also grant injunctive relief in a default judgment. See Trs. of the Nat'l Asbestos Workers Pension Fund v. Ideal Insulation, Inc., No.:ELH-11-832, 2011 U.S. Dist. LEXIS 124337, 12-13 (D. Md. Oct. 27, 2011)(*citing* Flynn v. Jocanz, 480 F. Supp. 2d 218, 221 (D.D.C. 2007)).

**1.     The evidence supports a finding that Defendants have tortiously interfered with Plaintiff's customer contracts it purchased under the APSA Contracts.**

The tort of intentional interference with a contract occurs when "a third party's intentional interference with another in his or her business or occupation induces a

breach of an existing contract." <u>Macklin v. Robert Logan Assocs</u>., 334 Md. 287, 297, 639 A.2d 112 (1994). A plaintiff must demonstrate that the third party knew of the contract's existence and that the third party induced or caused the contracting party to breach the contract. <u>Mixter v. Farmer</u>, 215 Md. App. 536, 548, 81 A.3d 631 (2013). The third party's conduct "need not necessarily be egregious in nature but only intentional for the improper purpose of inducing the [party] to repudiate his contract." <u>Sharrow v. State Farm Mut. Auto. Ins. Co.</u>, 306 Md. 754, 511 A.2d 492, 499 (1986). Such an improper purpose includes the third party acting "solely to benefit himself, or to cause injury to another, without a right to so act." Id. at 498.

In this case, Plaintiff purchased Defendant Integrated's monitoring contracts with its customers. Both Integrated and Tassin promised not to solicit the customer accounts it sold to Plaintiff. Having judicially admitted the allegations in Plaintiff's Complaint by default, and as further evidenced by the declaration of Ms. Gonzales (one of Plaintiff's customers), the evidence is clear that Defendants have induced the customers to breach their contracts with Plaintiff. Tassin and Integrated have falsely told Plaintiff's customer base that Plaintiff is incompetent or that Defendants are no longer working with Plaintiff in order to persuade the customers to send their monthly payments to Defendants instead of Plaintiff.

Defendant's actions have caused the loss of half of the accounts purchased under the APSA3. Plaintiff normally experiences a loss rate of less than 5% of purchased accounts during the first year after purchase. <u>See</u> Westhoff Declaration, ¶23. In this case, Plaintiff has experienced an abnormally high rate of loss of 50% in less than a year since

9

closing, leading to the conclusion that Defendants illegal conduct has, in fact, caused the loss in accounts. Id.

This loss of accounts as a result of Defendants' tortious conduct caused financial damage to Plaintiff. Westhoff's declaration proves that Plaintiff has lost $184,268 in profits from the lost accounts. Both Defendants, therefore, are jointly and severally liable for this damage element because both have tortuously interfered with AFA's customer contracts.

In addition, Tassin caused Integrated to breach the APSA Contracts by refusing to reprogram its customer's panels to AFA's third-party monitoring station. The APSA contracts require Integrated to reprogram the accounts. See Exhibit 2-4, ¶7.3. Westhoff's Declaration proves that the cost of curing Integrated's breach, and Tassin's tortious interference with the APSA3 by physically reprogramming the panels to get around Defendant's refusal to provide the codes, is $51,200. Both Defendants are jointly and severally liable for this element of damage, albeit under different legal theories. Therefore, a total money judgment of $235,468 ($184,268 + $51,200) against Defendants jointly and severally is appropriate.

**2. Plaintiff is entitled to a permanent injunction restraining Defendants from further interfering with Plaintiff's Portfolio contracts.**

The four factor test to determine whether to issue a permanent injunction is well known to the court:

> A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a

permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641, (2006).

Plaintiff asks the Court to enter an order for injunctive relief against Defendant as follows:

1. Restraining Defendants from taking any actions intended to induce any of the customers identified in Exhibit 1 filed under seal in support of this motion to breach the contracts AFA acquired through the APSA contracts;

2. Restraining Defendants from reselling any of the accounts identified in Exhibit 1 filed under seal in support of this motion to breach the contracts AFA acquired through the APSA contracts.

3. Ordering Defendants to provide AFA with customer programming codes and otherwise cooperating with AFA's efforts to switch customer account monitoring;

### A.   Plaintiff has suffered irreparable harm

Plaintiff has suffered irreparable harm for two reasons. First, Defendants have caused actual financial damage to Plaintiff through the loss of half of the APSA3 portfolio, which they appear not to care much about as evidenced by their failure to respond to this lawsuit. If left unrestrained, Plaintiff will continue to accrue financial damages that Defendants are unwilling to recognize. Second, Defendants' interference with Plaintiff's contracts will further erode the goodwill and negatively impact the relationship between Plaintiff and its customers. Defendants interference with the contract by redirecting the payment stream is also likely to cause confusion amongst the

customer base to the point where many customers will stop honoring the contracts altogether or terminate their contract as quickly as possible. Plaintiff is entitled to enjoy the goodwill within the Portfolio, which could possibly translate into recurring revenues for years after the various customer contracts are subject to termination.

### B. Monetary damages are not adequate to compensate Plaintiff for future loss.

Plaintiff has already lost half of its customer base. The only way to preserve the remaining customer base is to restrain Defendants from further interference. Otherwise, the Court will enter final judgment and Defendants will continue to go after the remaining customers. The damage amount requested above only reflects the lost profits on the lost customer base. The purpose of the restraining order would be to protect the profits flowing from the remaining customer base. The order requiring Defendants to cooperate with the required reprogramming does not translate neatly into lost dollars. Rather, the accounts needs to be monitored by the entity entitled to receive payment for same. Defendants' refusal to cooperate with a transfer of the monitoring may put lives and property at risk.

### C. The balance of harm is in Plaintiff's favor.

The balancing of the harms tilts decidedly in Plaintiff's favor. Plaintiff has already paid Defendants in excess of $500,000 for the income stream generated by the customer accounts. Defendants are now having their cake and eating it too because they have kept the payment made under the APSA Contracts and they are receiving the income stream they sold to Plaintiff. Indeed, there is virtually no harm to Defendants

whatsoever in granting the injunction because they have received everything to which they are entitled under the APSA Contracts.

### D. The public's interest favors granting relief

The public interest factor also militates in favor of issuing an injunction. Defendant has created uncertainty amongst the customer base. Therefore, the customers will benefit from a court order making it clear that they should remit payment to AFA and contact AFA for their future servicing needs. Furthermore, Defendants' actions threaten Plaintiff's ability to maintain positive control over the monitoring systems because they have refused to cooperate with the necessary reprogramming.

### 3. Plaintiff is entitled to attorney's fees.

Plaintiff is entitled to a judgment for attorney's fees under paragraph 10.4 of the APSA, which allows the prevailing party in litigation to recover fees. According to the Declaration of Brett Dressler filed in support of this motion, Plaintiff has incurred $11,267 in attorney's fees. See Exhibit 8, Dressler Declaration.

### Conclusion

Plaintiff asks the Court to enter final judgment against Defendants jointly and severally in the amount of $246,735, which represents $235,468 in damages and $11,267 in attorney's fees plus costs of court. Plaintiff further asks the Court to enter an order granting the above-requested injunctive relief.

Dated this 16th day of January, 2018.

/s/   Brett Dressler
(N.C. Bar #34516, Admitted PHV)
Sellers, Ayers, Dortch & Lyons, P.A.
301 S. McDowell Street, Suite 410
Charlotte, NC  28204
(704) 377-5050
(704) 927-2868 (facsimile)
bdressler@sellersayers.com

/s/ Rachel M. Severance
Rachel M. Severance
Federal Bar No. 30228
rseverance@foxrothschild.com
FOX ROTHSCHILD, LLP
1030 15th Street NW, Suite 380 East
Washington, DC 20005
Telephone: (202) 696-1466
Fax: (202) 461-3102
*Attorney for Plaintiff*

**Certificate of Service**

    I hereby certify that on January 16, 2018 a true and correct copy of the foregoing Plaintiff's Memorandum in Support of Motion for Default Judgment was mailed by United States Postal Service to the following non-participants in Electronic Case Filing:

Tassin Integrated c/o Nicholas Tassin, Registered Agent
Nicholas Tassin, Individually
1245 Aris Avenue
Metarie, LA  70005

/s/ Brett E. Dressler
Brett E. Dressler (Fed. Bar No. 34516NC)
*Lawyer for Alarm Funding Associates LLC*
Sellers, Ayers, Dortch and Lyons, P.A.
410 Cameron-Brown Building
301 South McDowell Street
Charlotte, NC 28204-2686
(704) 377-5050
(704) 339-0172 Facsimile
Bdressler@sellersayers.com