IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

FILED _____ ENTERED
LODGED _____ RECEIVED

JAN 18 2018

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

| | |
|---|---|
| ALARM FUNDING ASSOCIATES, LLC, a Maryland limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>TASSIN INTEGRATED SYSTEMS, LLC, a Louisiana limited liability company; and NICHOLAS TASSIN, individually,<br><br>Defendants. | Civil Action No. 1:17-cv-03131-RDB |

## FINAL JUDGMENT

After considering the pleadings, Plaintiff's Motion for Default Judgment, the evidence and Plaintiff's memorandum in support of same, the Court hereby enters final judgment.

The defendants, Tassin Integrated Systems, LLC and Nicholas Tassin, having failed to plead or otherwise defend in this action, and default having heretofore been entered; upon motion of the plaintiff and upon the evidence submitted in support of its motion; that defendants have been defaulted for failure to appear pursuant to Rule 55(a) of the Federal Rules of Civil Procedure; it is hereby ORDERED, ADJUDGED, and DECREED that plaintiff, Alarm Funding Systems, LLC recover of the defendants, jointly and severally, the sum of $235,468 in damages, $11,267 for attorneys' fees plus costs of court and interest according to law from the date of this judgment until the entire amount is paid.

As to Plaintiff's request for injunctive relief, the Court makes the following findings of fact:

1. Alarm Funding Associations purchases security monitoring contracts from independent dealers to provide dealers with capital in exchange for the future revenue generated by the customer contracts.

2. In doing so, AFA and the dealer hold AFA out to the dealer's customers as a new billing and collections specialist for the dealer, but in reality, AFA actually owns the dealer contracts.

3. Defendants are engaged in the sale, installation and monitoring of residential and commercial burglar and fire alarm systems in the areas surrounding Metarie, LA, including areas in Mississippi.

4. Defendant Integrated is not licensed to sell, install or monitor alarm systems in the state of Mississippi.

5. The AFA business model enables dealers, like Integrated and Tassin, to maintain their relationships with their customer base even though they have sold the customer contracts to AFA.

6. The business model is advantageous to dealers like the defendants because it allows them to generate additional revenue through service calls or referrals generated by the very same customer base it no longer owns.

7. AFA's business model also depends on preserving the goodwill of the customer base to insure the customer base will continue to make monthly payments in the future and AFA's dealers and owners are contractually required to take and avoid certain actions in order to maintain good working relationships with the parties' mutual customers.

8. Defendant Integrated sold 715 customer accounts to AFA through a series of three agreements in exchange for initial payments totaling in excess of $520,000 These contracts are as follows:

   a. On March 26, 2014, AFA and Defendants signed the first of three Account Purchase and Sale Agreements ("APSA1") in which AFA purchased some of Integrated's customer accounts. The contract required AFA to pay a multiple of recurring monthly revenue generated by each account to Integrated. In exchange, AFA acquired the customer accounts and the associated right to receive all future revenues from each account for a certain period of time.

b. On November 21, 2015, the parties executed a second APSA ("APSA2") with terms substantially the same as those in APSA1.

c. On March 31, 2017, the parties executed a third APSA ("APSA3") with terms substantially the same as those in APSA1. Each contract has an Exhibit A setting forth the details of the accounts purchased with the total recurring monthly revenue for each.

Collectively these Contracts are referred to as the APSA Contracts. The contracts are attached to Westhoff's Declaration filed in support of AFA's Motion to Seal.

9. Each APSA Contract has an Exhibit A setting forth the details of the accounts purchased with the total recurring monthly revenue for each. Exhibit 1 filed under seal in support of Plaintiff's Motion for Default Judgment is a compilation of all three customer account lists (hereinafter "Purchased Accounts") attached to the three APSA contracts.

10. Section 7.3 of the APSA contracts require Defendants to cause the customer accounts to communicate with AFA's own designated central station.

11. Section 7.3 also states that AFA shall take over all 800 lines associated with the purchased accounts, which was necessary to transfer the monitoring services from the third-party over to AFA's central station, i.e., "swinging" the line.

12. Defendants have refused to swing or reprogram the lines associated with Defendants' customer accounts over to AFA's central station and provide AFA with information necessary to insure continued monitoring, such as customer programming codes. The refusal to provide AFA with the programming codes will increase the cost of moving the monitoring over to AFA's third-party central monitoring station.

13. Plaintiff will also have to pay a technician to manually reprogram and/or replace each customer panel so that it will communicate with Plaintiff's own designated central station, which Defendants are required to do under Section 7.3 of the APSA Contracts.

14. Defendants utilize a remote downloader on their computer so they can dial into each customer panel at any time. They use a lock out code to communicate with the alarm panel and make any reprograming changes, including to which central station the alarm panel reports.

15. Defendants have been remotely reprograming Plaintiff's customers so that their alarm panels will report to a different central station than that agreed upon in Section 7.3 of the APSA Contracts.

3

16. Had Defendants provided the lock out codes as required under the APSA Contracts, it would have only been necessary to pay for labor and reprogramming at each customer location.

17. Because Defendants did not provide the lock out codes, Plaintiff will have to actually replace the customer's equipment in order to reprogram it to the central station to obtain compliance with Section 7.3. Based on AFA's historical experience in the industry, Plaintiff anticipates it will spend $400 per account to forcibly reprogram each panel for each purchased account in order to transfer the monitoring. AFA still needs to reprogram 128 panels in connection with APSA3. At $400 per panel, Plaintiff will incur damages of $51,200 in order to reprogram the panels.

18. With respect to solicitation and customer loss, Exhibit C to the APSA contracts state:

> AFA shall pay to Seller, which payments will benefit Seller, as consideration for this Agreement the, amounts called for under the Purchase and Sale Agreement for the Alarm Accounts. In recognition and specific acknowledgment of AFA's legitimate need to protect its investment in the Purchased Accounts, Seller, jointly and severally, covenant and agree that they shall not:
>
> ********
>
> (b) for a period of ten years following the date of transfer of each Alarm Account under the Purchase and Sale Agreement, directly or indirectly on his or its own behalf or as seller, employee or consultant for another, contact, solicit or otherwise seek to do business with such Alarm Account providing services for which such Alarm Account is obligated to make payments of Monitoring Rate (as defined in the Purchase and Sale Agreement) to AFA, or accept or otherwise engage in any such business with such Alarm Account other than those allowed under the terms and conditions set forth in Section 8, Maintenance Services and Post-Closing Payment for Net Monthly Maintenance Revenue, and Section L4 (d), Revenue Guarantee Adjustment, of the Purchase and Sale Agreement
>
> (c) for a period of ten years following sale of a Purchased Account by AFA, directly or indirectly on his or its own behalf or as seller, employee or consultant for another, contact, solicit or otherwise seek to do business with such Purchased Account providing any services in the residential or commercial burglar or fire alarm business, or accept or otherwise engage in any such business with such Purchased Account other than those allowed under the terms and conditions set forth in Section 8, Maintenance Services and Post-Closing Payment for Net Monthly

Maintenance Revenue, and Section 1.4 (d), Revenue Guarantee Adjustment, of the Purchase and Sale Agreement

19.  Defendants have told customers that they should continue making payments to Defendants because Defendants are no longer using AFA. See Declaration of Kathleen Gonzales.

20.  Defendants are also attempting to sell the same APSA Contract customers to competing dealers. See Declaration of James Miller.

21.  Integrated and Tassin are irrevocably destroying the goodwill essential to AFA receiving the benefit of its bargain by telling customers that AFA is incompetent and to make payment to Integrated instead of AFA.

22.  If left unchecked and unrestrained, AFA stands to lose the benefit of its bargain with Defendants. Plaintiff brings this suit to enjoin Defendants from stealing additional accounts and for money damages associated with its conduct.

23.  Plaintiff purchased 251 accounts from Defendant through the APSA3 contract. AFA typically experiences a loss of approximately 5% of accounts in any given portfolio during the year after acquiring the accounts. In this case, AFA has lost 123 APSA3 accounts within the first year, which is nearly 50% of Defendant's APSA3 portfolio since closing a year ago. The loss rate on the APSA3 portfolio is ten times more than the loss rate AFA normally experiences.

24.  AFA has been in business since 2005. It has purchased more than 200,000 accounts since its inception. The overwhelming majority of accounts AFA has purchased from dealers continue to pay monthly revenue equal to or more than the initial rate for more than 5 years post-closing. AFA's historical gross margin of return, or profit, on each account is 72%.

25.  In this case, AFA has lost 123 accounts representing a total loss of $4,259.55 in recurring monthly revenue. Defendant has failed to replace the accounts. The lost profits on these accounts is $184,268, which is calculated by applying AFA's historical gross margin of return to the lost monthly revenue multiplied by 60 months. Therefore, AFA has lost $184,268 in profits as a result of Defendant's failure to replace lost accounts as required by Section 1.4 of APSA3.

26.  Defendants judicially admit that Defendant Nicholas Tassin has been telling customers within the Portfolio that AFA is incompetent or that he is no longer dealing with AFA and that the customer/s should resume paying Defendants instead of AFA.

27.  Defendants admit that they have been accepting payments from

5

customers within the Portfolio that belong to AFA..

28.  Defendants' admit their conduct threatens to destroy the goodwill and financial viability of the Portfolio.

29.  Defendants admit they are also actively soliciting AFA's competitors to sell the very same accounts they sold to AFA.

30.  In particular, Defendant Nicholas Tassin, on Defendants' behalf, has negotiated with SEP Holding Company, LLC, doing business as SEP Funding, for the sale of customer accounts that belong to AFA.

31.  Defendants and SEP Funding executed documents for the "resale" of hundreds of accounts Integrated previously sold to AFA.

32.  Defendants and SEP Funding were scheduled to close on their transaction on October 30, 2017, but SEP Funding uncovered Defendants' attempted fraud and cancelled the transaction.

THEREFORE, IT IS ORDERED, ADJUDGED AND DEGREED AS FOLLOWS:

1.  Defendants, their agents, servants, employees and anybody acting in concert with them are enjoined from, directly or indirectly, accepting any payments made by or on behalf of any of the Purchased Accounts (Exhibit 1 filed under seal in support of the Motion for Default Judgment);

2.  Defendants, their agents, servants, employees and anybody acting in concert with them are enjoined from, directly or indirectly, causing any Purchased Account customer to make any payments due on the contracts underlying the Purchased Accounts to any entity other than AFA and are further restrained from taking any actions intended to induce such customers from breaching the monitoring agreements AFA purchased from Defendants;

3.  For any payments the Purchased Account customers make directly to Defendants, Defendants shall forward such payment to AFA within 24 hours of receipt

6

via US Mail, postage paid, addressed to AFA, 1646 West Chester Pike, Suite 31, West Chester, PA 19382.

4.  Defendants their agents, servants, employees and anybody acting in concert with them are enjoined, directly or indirectly, from reselling any of the Purchases Accounts identified in Exhibit 1 filed under seal in support of this motion.

5.  Defendants are ORDERED to provide AFA with customer programming codes for each Purchased Account that has not been switched over to AFA's third-party central monitoring station and to otherwise cooperate with AFA's efforts to switch customer account monitoring.

DATED: _January 18, 2018_

_____
Judge Richard D. Bennett
United States District Court Judge